UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARAYA WATKINS, as
Next Friend of JOHN PONDS, a Minor,     Case No. 2017-

   Plaintiff,                                  HON.

v.

MING-SING SI, M.D.

   Defendant.
_____
SEIKALY, STEWART & BENNETT, P.C.
JEFFREY T. STEWART (P24138)
30445 Northwestern Highway, Ste. 250
Farmington Hills, MI 48334
(248) 785-0102
Attorneys for Plaintiff
_____

**COMPLAINT AND DEMAND FOR TRIAL BY JURY**

NOW COMES CHARAYA WATKINS, duly appointed Next Friend for John Ponds, a Minor, by her attorneys, SEIKALY, STEWART & BENNETT, P.C., and for her complaint against the defendant, states as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Charaya Watkins is a resident of Toledo, Ohio. She is the duly appointed Next Friend of John Ponds, a Minor, who also is a permanent resident of the State of Ohio. John is the injured party for whose benefit this claim is brought.

2. Ming-Sing Si, M.D. is a physician licensed in the State of Michigan. He also resides here.

3. Jurisdiction is proper in this Court under 28 USC ¶1332 because:

   a. There is complete diversity of citizenship, since the plaintiffs are residents of Ohio and the defendant is a resident of Michigan;

   b. The amount in controversy exceeds $75,000 exclusive of interest, costs and fees.

4. Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because the defendant resides in this District and the initial damage arising from the medical malpractice alleged occurred within this District.

**Allegations under Michigan Medical Malpractice Law**

5. This claim was preceded by a notice of intent to make claim, as required by MCL 600.2912b; and more than 182 days have elapsed since it was sent.

6. Upon information and belief, defendant Si is board certified in surgery, thoracic and cardiac surgery and congenital cardiac surgery.

7. The most relevant specialty to the cause of action alleged in this case is congenital cardiac surgery.

8. This claim is supported by an affidavit of merit (attached as Exhibit 1) as required by MCL 600.2912d.  It is signed by a physician who is board certified in congenital cardiac surgery: the specialty most relevant to the malpractice alleged in this case against Dr. Si.

## COMMON ALLEGATIONS

9. John Ponds ("John") was born on December 24, 2012.  John was diagnosed with failure to thrive, and diagnostic testing performed in July 2013 showed an atrial septal defect (ASD) extending to the superior vena cava.

10. These and other findings were consistent with a sinus venosus ASD with partial anomalous pulmonary venous return.

11. This was a congenital cardiac defect that is routinely repaired with very low morbidity and mortality.

12. On August 5, 2013 the defendant Dr. Si operated on John.

13. The details of the procedure are described in paragraph five of the accompanying affidavit of merit.

14. Testing of John as he was coming off bypass demonstrated a significant obstruction between the pulmonary veins and the mitral valve, which was misinterpreted as a cor triatriatum by Dr. Si and a cardiologist who was consulting on the case.

15. After an attempt at repair, a large amount of bleeding was noted from behind the heart and, upon further evaluation it was noted that injuries to the coronary sinus and circumflex coronary artery had occurred.

16. An additional repair was an attempted, resulting in an apparent IVC obstruction and possible drainage of the pulmonary veins into the right atrium.

17. By this time, the patient was so compromised that it was necessary to put him on Extracorporeal Membrane Oxygenation (ECMO). John required numerous additional procedures as detailed in paragraph 9 of the accompanying affidavit of merit.

18. On August 18, 2013 John was found to have a thrombosed LLPV, which was no longer in continuity with his left atrium. He required a thrombectomy to reopen the distal LLPV and underwent additional procedures described in paragraph 10 of the accompanying affidavit of merit.

19. As a direct consequence of the medical errors described above and the efforts made to correct them, John has been severely injured and currently suffers from greatly diminished perfusion to his left lung, pulmonary hypertension, atrial arrhythmias, and diminished LV function.

20. In an effort to repair the damage described above and improve his function generally, John was operated on at the Cleveland Clinic in Ohio in 2016. His left lower pulmonary vein was found to be beyond repair. His left upper

pulmonary vein was treated with balloon dilation. However, more likely than not, the vein will undergo restenosis.

21. John also required placement of a permanent epicardial pacemaker.

22. As a consequence of all of the foregoing injuries occurring, not as a result of John's initial presenting condition, but rather as a consequence of the medical errors described above, John has a shortened life expectancy, severely compromised physical function, and mental impairments. He is at constant risk of further cardiopulmonary injury and death.

23. John requires numerous special measures, including special feeding, to maintain his existence.

24. As a direct and proximate result of the foregoing, there have been enormous medical expenses which are expected to continue for the rest of John's life.

25. John will suffer a loss of earnings and earning capacity as a result of his impaired status as he will not be able to perform the usual and customary physical functions required of most employments for which he would otherwise have been suited.

## COUNT I – NEGLIGENCE OF MING-SING SI, M.D.

26. Plaintiff reincorporates all of the foregoing allegations of the complaint as though fully restated herein.

27. Dr. Si was required by the standard of care applicable to a board-certified congenital cardiac surgeon to:

   a. perform a thorough preoperative evaluation of John so as to determine prior to the start of surgery the most appropriate methods of treating his ASD;

   b. plan the surgery with reasonable care so as to utilize the techniques and methods most likely to produce a favorable outcome;

   c. perform the surgery with reasonable skill and care, being careful not to damage structures of the heart and its connected vessels;

   d. upon abnormalities becoming evident after the initial procedure, recognize that the problem was likely not a cor triatriatum but rather direct interference with blood flow within the heart caused by Dr. Si's procedure;

   e. conduct the necessary repairs properly and effectively rather than causing additional injury and damage through further technical errors, which included attempting to make the repair when he could not visualize the affected area properly and injuring the vessels and structures of the heart in the process.

28. Dr. Si breached each and every one of the foregoing duties. The breaches of duty were, individually and collectively, a proximate cause of the injuries and damages to John hereinbefore set forth.

29. Additional detail as to the duties, breach thereof and the damages proximately resulting is set forth in the accompanying affidavit of merit.

WHEREFORE, plaintiff claims judgment against the defendant, Ming-Sing Si, M.D. in an amount in excess of Seventy-Five Thousand and no/100 ($75,000) Dollars to which she is found to be entitled on behalf of John Ponds, together with interest, costs and reasonable attorney fees.

                SEIKALY STEWART & BENNETT, P.C.
                Attorneys for plaintiff

                /s/ Jeffrey T. Stewart
                JEFFREY T. STEWART (P24138)
                30445 Northwestern Highway, Ste. 250
                Farmington Hills, MI 48334
                (248) 785-0102

Dated:  September 21, 2017

## DEMAND FOR TRIAL BY JURY

The plaintiff hereby demands trial by jury.

        SEIKALY STEWART & BENNETT, P.C.
        Attorneys for plaintiff

        /s/ Jeffrey T. Stewart
        JEFFREY T. STEWART (P24138)
        30445 Northwestern Highway, Ste. 250
        Farmington Hills, MI 48334
        (248) 785-0102

Dated: September 21, 2017

pond49.docx

# EXHIBIT 1

STATE OF OHIO           )
                        ) ss.
COUNTY OF _____        )

## AFFIDAVIT OF MERIT OF V. SIMON ABRAHAM, M.D.

V. Simon Abraham, M.D. being first duly sworn, both deposes and says that the following affidavit is based upon his professional education, training and experience and the documents specifically referenced below. This affidavit is true and accurate and if called as a witness, he could competently testify hereto. The deponent further says:

1. I am a physician licensed to practice in the states of Indiana and Ohio I am board certified in thoracic surgery and congenital heart surgery. For the 12 months (and longer) preceding August 5, 2013, I spent the majority of my professional time in the practice of heart surgery on children with heart defects.

2. I have reviewed medical records provided to me of treatment provided to John Ponds, (DOB 12/24/12) during his hospitalization from 8/05/2013 to 10/4/2013 as well as other medical records of treatment rendered to John since that time. I have also reviewed a Notice of Intent to make claim, dated September 11, 2015.

3. John was diagnosed with failure to thrive and his preoperative echo (7/31/2013) showed an Atrial Septal Defect (ASD) extending to the Superior Vena Cava (SVC) with his Right upper pulmonary vein entering the left atrium close to the SVC. He also displayed echographic signs of right sided volume overload with a dilated Right atrium and ventricle and some evidence for valvar pulmonary stenosis.

4. These findings are consistent with a sinus venosus ASD with partial anomalous pulmonary venous return. This is a defect that is repaired with very low morbidity

and mortality throughout the world.  While most of these repairs take place at an older age, repair can be undertaken with excellent results whenever the patient becomes symptomatic especially at large volume centers such as the University of Michigan.

    5.  With the clinical and echocardiographic picture outlined above, he was taken to the operating room on 8/5/2013 for repair of sinus venosus ASD with partial anomalous venous return (PAPVR) and intraoperative evaluation of his pulmonary valvar stenosis. Intraoperatively, he was found to have both a superior and inferior sinus venosus ASDs with pulmonary veins draining into the atrium but close to the orifices of the SVC and IVC. The defects were then closed with two separate patches of Gore-Tex which were then sutured together.

    6.  Upon coming off bypass, the intraoperative TEE demonstrated significant obstruction between the pulmonary veins and the mitral valve and this was interpreted as a cor triatriatum by the cardiologist and operating surgeon.  It should be noted that this finding was not seen preoperatively and the flow acceleration seen on TEE was more likely due to a consequence of the repair rather than a previously unseen anatomic problem.

    7.  The patient was returned to bypass and the previous patch repair was not taken down but incised to access the left atrium.  A resection of left atrial muscle was carried out in the posterior left atrium (LA).  Visualization was noted to be poor and no 'definite ring' was seen. An additional patch was placed and the heart was closed. Upon filling the heart, a large amount of bleeding was noted from behind the heart and a left atriotomy, coronary sinus and circumflex coronary artery injuries were subsequently appreciated.

    8.  An initial attempt at repair from the exterior of the heart was unsuccessful so the previous repair was taken down under a period of deep hypothermic circulatory arrest. The

previous patch was removed, the left atriotomies were closed and a new single patch was placed. However, this repair resulted in what seems to be IVC obstruction and possible drainage of the pulmonary veins into the right atrium. An additional period of circulatory arrest was utilized with a repair utilizing a larger patch and revision of the previous left atriotomy closure due to concerns about obstruction of the left pulmonary veins. The patient was quite tenuous coming off bypass and was converted to VA ECMO at the completion of the procedure and left the operating room with an open chest.

9. The patient required numerous procedures following this initial surgery including mediastinal re-exploration, bronchoscopy, ECMO cannula repositioning, decannulation from ECMO, chest closure, etc. John underwent subsequent right and left heart catheterization on 8/16/2013 due to bleeding from his airway as well as the finding of intermittent left pulmonary artery flow reversal on echocardiogram. This study demonstrated obstruction of his Left Lower Pulmonary Vein (LLPV).

10. John was returned to the operating room on 8/18/13. He was found to have a thrombosed LLPV which was no longer in continuity with his left atrium. Following a thrombectomy to reopen the distal LLPV, he underwent a LA-LLPV anastomosis under circulatory arrest utilizing a patch of autologous pericardium; his intra-atrial patch went another revision during this operation.

11. Despite his numerous surgical complications and multiple operations, John was able to be discharged from the hospital about six weeks later

12. After discharge, John did reasonably well clinically but he does become tired easily and has intermittent perioral cyanosis. He has shown evidence of pulmonary hypertension and compromised pulmonary flow to his left lung with perfusion scans showing

3

between 6.5-11% blood flow (normally 45%) to the left side. In addition, he has the propensity to have atrial arrhythmias and has evidence of diminished LV function, both of which are being treated medically.

13. He was subsequently seen at the Cleveland Clinic where he underwent cardiac catheterization which demonstrated loss of his LLPV with stenosis of his LUPV and RLPV. His RV pressure was ⅔ systemic. He had repeat cardiac surgery with replacement of his Gore-Tex intraatrial patch with autologous pericardium, 'sutureless' repair of his RLPV and balloon dilation of his LUPV. His LLPV was occluded and not thought to be reconstructable. While the operation is considered a success, the long term fate of his LUPV is unknown as restenosis following balloon dilation of pulmonary veins is common. In addition, given multiple bouts of atrial arrhythmias, a permanent epicardial pacemaker was placed.

14. I have been advised that my opinions need to be expressed in light of legal standards and terms including "standard of care" and "proximate cause". I have been asked to assume that "breaching the standard of care" means failing to treat the patient as would the reasonably prudent practitioner of ordinary skill and learning practicing in the same specialty. I have also been asked to assume that "proximate cause" means that the breach of the standard of care must be the cause-in-fact of the harm and that the harm must have been reasonably foreseeable as a natural and probable result of the breach at the time the breach was being committed.

15. In my opinion it was a breach of the standard of care to interpret the initial postoperative echocardiogram showing obstruction following repair as arising from a cor triatriatum which had never been noted on any previous echographic studies including the immediate pre op echo and then pursuing the resection of (in retrospect, nonexistent) obstructive

4

tissue within the left atrium. In this situation, Dr. Si breached the standard of care by attempting to preserve the repair by incising it and working through a small hole, instead of taking down the previous repair so as to fully visualize the posterior left atrium.

16.  Dr. Si also used a less advantageous method of repair in closing this defect with multiple Gore-Tex patches. The approach taken makes it quite difficult to create an adequate volume pathway. A single autologous pericardial patch is far more flexible, has some degree of compliance and is therefore, much more forgiving in a low pressure atrial circuit.

17.  Clearly the initial operation did not meet the standard of care. Repair of sinus venosus ASD with PAPVR usually involves a 3-5 day hospitalization with trivial risk of mortality and very low morbidity. This case, in contrast, has already required multiple operations at two institutions to stabilize the patient and has left this child and family with a suboptimal result that will affect him going forward with a) reduced quality of life b) decreased lifespan c) significant ongoing needs due to medical debility.

18.  It is my opinion that the breaches of the standards of care set forth above are a proximate cause of ongoing physical problems for John that he would not otherwise have been expected to experience. These medical problems include:

    a)  John's quality of life has been irrevocably diminished due to permanently reduced cardiac function (coronary artery injury), residual or recurrent pulmonary hypertension (pulmonary vein occlusion and likely recurrent stenosis of the LUPV), recurrent atrial arrhythmias (multiple atrial suture lines, pacemaker placement) and developmental delay (prolonged hospitalization, ECMO, multiple episodes of hypothermic circulatory arrest).

    b) John will require life-long medical follow up for his reduced LV function due to injury to branches of the circumflex coronary artery. This injury would lead to loss of myocardium of his posterolateral wall and is noted as inferior akinesis of his LV on multiple postoperative echocardiograms. This problem has no surgical solution.

    c) His pulmonary hypertension will require medical treatment and I do believe that if his LUPV stenosis returns or worsens that he could lose the minimal gas exchange function of this lung permanently.

    d) Eventually, his pulmonary artery pressures will worsen and he will develop right heart failure that is not amenable to further treatment.

    e) He has had multiple bouts of atrial arrhythmias that are due to his multiple surgical suture lines well as his right atrial dilation due to elevated right sided pressures. He will require medical treatment for this in addition to the permanent pacemaker placed at Cleveland Clinic that will require regular follow up and eventual replacement of batteries and leads.

    f) His overall cardiopulmonary status and his exercise capacity will be limited. I think this will become more obvious as he grows in comparison to his peer group.

  19. John has been noted to be developmentally delayed. Repeated and prolonged episodes of hypothermic circulatory arrest, ECMO, multiple anesthetics are all associated with developmental delay without obvious structural abnormalities of the brain. Children who are subjected to these therapies often show poor executive function, attention deficits and fare poorly in school.

20. He is likely to continue to have occlusion and significant stenosis of the pulmonary veins to the left lung and pulmonary hypertension as previously discussed. I think there is a high likelihood that his PA pressures will remain high given that his lungs have seen venous obstruction for an extended period leading to permanent changes in his pulmonary vasculature. The latest data point available to me is the catheterization data from Cleveland Clinic which shows PA pressures approximately ⅔ systemic. These data predate the surgical repair and are obtained under anesthesia so those issues do confound our understanding of what will happen in the future.

21. John will continue to utilize significant medical resources going forward. These will include ongoing follow up with multiple specialists over his lifetime: cardiologists, electrophysiologists, pulmonologists and developmental specialists as he grows older. He has numerous hospitalizations and well as multiple diagnostic tests in his future.

22. He will require multiple medications, supplemental oxygen and depending on his course, I would foresee eventual intravenous medication for pulmonary hypertension.

23. All of these likely future untoward events are the actual and foreseeable results of the breaches of the standards of care outlined in this affidavit.

_____
V Simon Abraham, MD, FACS

Subscribed and sworn to before
me this  12  day of  September, 2017.

_____, Notary Public
Cuyahoga            County, Ohio

My commission expires:  09-15-2018
pond48.docx

JACQUELINE DIXON
Notary Public
In and for
the State of Ohio
My Commission Expires

7